The next case call for oral argument is People v. Rakers. Counsel, whenever you're ready, you may proceed. All right, buddy. Can I go? Absolutely. This is a DUI conviction by a jury, and I'm going to state to you the reasons why I think it should be reversed. Briefly, factually, on March 19, 2011, the defendant, Maurice Rakers, and his significant other, Kathy Bowman, and a contractor associate, Benjamin Kunz, all met at the Eagles in Edwardsville. Now, Rakers is an entrepreneur. He has a construction company called All-Purpose Erectors, of which he did Churchill Downs, Chicago Motor Speedway. And he met, had a pre-arranged dinner for a business meeting with a Dave Faze, who was developing property at Port de Sue area. And it was important that he get the contract for the lighting, and Kunz get the contract for the concrete work, and the putting in the footings and all those things. Now, Kathy Bowman was his significant other, and she'd been with him a long time, and they are middle-aged people. And when they met at the Eagles, it was, Mr. Rakers stated he had one 12-ounce beer, and then they had, they were to meet at Gentleman's Restaurant in Alton. He had another beer there, and they had a discussion. I believe Kathy had a bottle of wine, and they all had dinner. They had a heavy dinner. My client had a steak and salad, and an adequate amount of protein and starch and whatnot. Now, the first impression I would like to make on you three of you is that this was a business meeting where Mr. Rakers was really working to try and get a business deal with Mr. Faze to make money. In other words, he was not out socially to get intoxicated, or make a fool out of himself, or make anything other than a very good impression of himself. His lady friend was also a very responsible person. She worked for O'Reilly Auto Parts as a manager. And they both stated that they had nothing to drink that day. She worked all day and came home, and that's when they left. Now, the difficulty occurred when Mr. Rakers, unfamiliar with the Affinity Automobile that Ms. Bowman owned, was driving her home from Gentleman's in Alton. They took 365 to Highway 270 and commenced to go eastbound to his home in Lebanon, Illinois. It was not an unreasonable hour. It was about 9 p.m. On the way home, this is very important, Mr. Rakers, in passing a semi-truck, thought that the truck was coming over, or had difficulty negotiating this truck, and hydroplaned into the middle of the four-lane highway. Now, it was a windy night, a wet night, and a cold night, and it was muddy and sloppy in the middle, and his car became impaled in this center area. Could not get it out. By making it go forward or backwards, he actually was going to have to get a tow truck. Now, all these things are very reasonable in light of what I've said. A, a business meeting. B, that the car went off the road due to the fact it was passing a truck. It's as easy to infer that the accident happened because of these circumstances as anything else. Now, a trooper Barnes came along, not a trooper Barnes, a police officer Barnes came along from the Glen Carbon Police Department, and he saw Mr. Rakers' predicament, and he deferred to Illinois State Trooper, Karen Draper. Now, this is all on video, and I don't know, I'm old-timey, and I'm before video. I don't know whether we deliver the video to the court, since it's been properly authenticated by the police officer, and it happened, and you get a chance to take a look at this situation, or whether or not you accept the jury's view of what they saw on the video. I don't know how you handle these things. It was admitted into evidence, though. Yes, it was. It was admitted into evidence, and I have a copy of it here. Yeah, but if it was admitted into evidence, it should possibly be in the record. I think it is. Okay. Okay. Now, now, now, then we commence the procedure of the arrest. Now, I know the first question that you, I think I know the first question you're going to ask me, and that is, have we relinquished jurisdiction in the summary suspension matter? And it's a civil matter, and have we relinquished jurisdiction in that matter because we did not file a notice of appeal in a timely fashion on that rescission of the summary suspension because it is a civil matter? Now, I'm familiar, I wasn't familiar until I read your brief, the Connors case, to be perfectly honest with you, and I was a little shocked at the Connors case, truthfully and fairly. Now, the Connors case appears to me to be ridiculous in this sense. Number one, if you're representing a criminal defendant, and you do your job and file a motion for summary suspension, and you have a hearing, and you lose that, are you then to file a notice of appeal during the period of time that you're waiting for the actual criminal case to come up, and then if you lose that, you appeal them both? Well, they're two different kinds of cases, aren't they? Well, actually not, and I'll tell you the reason why they're not. A motion to rescind the summary suspension in Coitus arrest was filed by me on April the 6th, 2011. I lost it. But the major component in this motion, although it is a civil matter, and although it's governed by 501, there's constitutional issues in that. A probable cause, a probable cause to stop is a constitutional issue. Now, in Connors, different than a constitutional issue, they said in that case that I think the test was adulterated or something like that, and that's the reason why they decided Connors in part. But here's a real full-blown constitutional issue, which has been raised in the motion to rescind summary suspension. And if we look at the federal cases of United States v. Gregory Robinson and Mandel, which is a further extension of this Connors case. Were those cited? Did you cite those in your brief? I will. I promise you. Tomorrow. I will supplement them. So is that a motion for leave to file a supplemental brief? Yes. May I have a motion? It's granted. Okay. All right. And I will get those up. We'll give the state an opportunity to respond. Yeah. Now, if we look at People v. Connors, we see that that case has got a flag on it. It's flagged. And it was a later decision called the People v. Manders, M-A-N-D-E-R-S, which is 740 Northeastern 64, 317 Illinois Fellow 3337. And this case in part goes along with Connors, but it says that why should we go along with Connors since a petition to suppress, a motion to suppress summary suspension is so intertwined that the court should accept this jurisdiction. Now, I'm asking that there is no firm case law in the 5th District on this issue. I'm saying that Connors, the petition arguing the breathalyzer to measure the blood alcohol concentration was improperly certified. That's the reason why they lost the summary suspension in Connors. That's the reason why they lost that because they did not properly certify the concentration of blood. Now, that's the reason why they lost the summary suspension. It was not a constitutional question like we have here raised by me in the motion for summary suspension to rescind it. The constitutional question is probable cause. Why did they stop? Why did they request that she give that my client submit to these testings when there was no reason, independent reason to do that? Now, getting back to the case. The decision of the court, I mean the decision of the jury was clearly against the manifest weight of the evidence. And we know what the manifest weight is in Harwood, which I cited in my brief. Manifest weight of evidence as a phrase is used in defining the limits of a pelt review is the weight which is evident, clear, plain, and undisputable. Now, it's clear, it's very clear by the record that Rakers was a businessman. It's very clear. There's nobody can give any evidence that he had beyond three beers in the spirit of time and that he had discussed this whole thing. And there's no evidence why he left the road other than his own testimony that he hydroplane at the side of this truck. Now, for the jury to grab onto this instruction, number 2329, that a person is under the influence of alcohol when as a result of drinking any amount of alcohol, his mental or physical, excuse me, I'm sorry, his mental or physical facilities are so impaired it has reduced him, his ability to think and act in an ordinary manner. Now, the state didn't prove that and there's nothing to the contrary in this situation. Now, I would like to go then to, in my second part of my argument, I'd like to go to the violations of McNown and the National Traffic Safety Act. Now, we know that the state police have accepted the promulgations of the National Traffic Safety Act. Now, we know that from the testimony of the trooper that the smell of alcohol on a person's breath, the bloodshot eyes, is not enough to raise probable cause. It may be enough to raise suspicion, esoteric suspicion, but it's not probable cause. And she admits that in her cross-examination of her. And on page 111, page 46 of the record, A59, and your studies at the Illinois Bureau of your refresher course and all the stuff on DUI, have you studied that detection of alcohol on a person's breath is a completely unreliable factor in determining whether a person is under the influence? And her answer, the trooper's answer, we were trained that it was reasonable suspicion to further investigate. Answer, okay, reasonable suspicion, right? Uh-huh. Not that a person was intoxicated beyond a reasonable doubt. Correct. She said it was not. All right. So we got those two components. We got alcohol on his breath, which he admittedly had on his breath because he'd been, he'd had a few beers at the business meeting. Number two, it does not clearly state anything about bloodshot eyes. But the third thing that she thought was important in a direct examination was that the HGN test be performed on him. Now, we earlier argued that there was no reason for this because there was no probable cause to do this. And that was part of our motion to suspend the summary suspension. And here's what she had to say on page 33 of the record. And I'm sure you can look at it later. It's R009833A46. What was the first part of the HGN? She said following smooth pursuit. And you ask him to move his head. Is there any significance to the fact that he moved his head? If I were moving your head, then your eyes don't move. Your eyes, your head moves. And what is the second part of the horizontal glazed nystigma test? That's to see if there's nystigmas as it moves horizontally, his eyes horizontally. Okay. The first time you moved your thumb across the long plane, the second time it's a little bit shorter, a shorter sweep there, if you will. What's the significance of that? Direct testimony, this is. Well, the third phase is to see if you get the nystigmas at a 45 degree angle, which is like 45 degrees from the nose, which was still quite showing on the part of the eye. Now, if you see nystigmas in that range, what does that indicate to you? That the person is under the influence of drugs or alcohol. Now, this is what she narrated to the jury. This is what she told to the jury. Okay. Then on her cross-examination, let me ask you this while you're looking there. What evidence is there that the trooper didn't properly administer the field sobriety test? All right. It's revealed on page 18 of the Supreme Court case of the people versus Joan McNown. It's clearly set forth on page 18. I'll read it to you. My question was what evidence was presented to the jury. The evidence that was presented to the jury was just what I read, the direct examination by the state's attorney. That's what was presented to the jury. That was presented to the jury. And then my cross-examination. But the McNown case tells us absolutely what we need on page 18 of this opinion. Whether the HGM test was properly administered by the officer in this case. That's on page 18. And Officer Katt was the officer in this case. And Officer Katt had been certified, but as you well know, that her testimony did not pass muster. Did not pass muster. So she testified that, first of all, you have to check the eyes for equal tracking before conducting the HGM test. That was not done. He did not testify that he checked her eyes for equal pupil size. That wasn't done. He did not describe the speed at which she moved the stylus. The stylus or that he held the stylus at a point maximum deviation for the requisite four seconds. That wasn't done. He did not testify that he repeated the procedure twice. That might have been done. I don't know. All of these things are required as protocol in the National Highway Traffic Safety Code. Now, the second part of the test, the second part of the test is the walk and turn. Now, it's very important in the walk and turn test that the National Highway Safety Act says that it's to be conducted on a dry level surface. Now, she did not conduct this test. You can see from the video at all. My man came right out of the mud in the middle of the whole area, and it was at a slope, and it was raining cats and dogs. And she had the headlights of her car shining right at him, and she was screaming at him. And she was telling him how to do this, right foot, right foot, left foot. And it was a muddy, wet surface, so that was not performed in a correct fashion. Neither was the one-legged stand performed in the correct fashion. So, all in all, if you take the people, and of course you could not judge the credibility of the witnesses or how they looked, but you can sense that they were pretty credible people. Mr. Rankers is in a construction business, and his lady and Mr. Koontz, they all testified that they did not, or he was not under the influence of alcohol. And that he appeared fine, and he drove from one place to the next place, and that there was nothing wrong with his driving, nor was he in any way impaired by virtue of the beers that he had. Thank you, counsel. It's a good place to end. He'll have some rebuttal time. It's a good place to end. Counsel? Counsel? May it please the court? Counsel? Thank you. My name is Sharon Shanahan, and I represent the people of the state of Illinois. I'd like to very briefly address the defendant's statutory summary suspension argument. It's a little puzzling that counsel says he's not aware of People v. O'Connor. On page 10 of the defendant's brief, he cites People v. O'Connor for the principle that a statutory summary suspension is civil and that a trial court's order to grant or deny a petition to rescind a summary suspension is a final and appealable order. Citing People v. O'Connor, the very case that the state cites for the principle that if the defendant wished to appeal this civil case, that he had to do it after that final and appealable order. He missed that by months. So there was no stay on that order. His suspension was? Final and appealable. But it should even probably be up by now, shouldn't it? I would think so. And I would note, as I say, page 10 of the defendant's brief, citing this very case, says a trial court's order to grant or deny a petition to rescind a summary suspension is a final and appealable order. So for a defendant now to say, and I can wait until after the criminal trial is over to appeal it, is kind of, well, puzzling. But I would briefly, the defense counsel also cited a case that is not in his brief, in addition to the federal court cases that he mentioned, People v. Manders. I would ask that since he discussed that, that it be included in the motion so that I don't know anything about it. We will grant counsel leave to file those cases, and we'll grant you leave to respond. So pretty briefly, I think the statutory summary suspension issue is there's no jurisdiction. And I would note that there's no argument in this brief about that statutory summary suspension. There's no cases cited. There's no citation of the facts. So even if it could somehow be conceivably still valid, it should be rejected. Justice Welch, you asked about the video. The video is not on the record. It was admitted into evidence. Was it a disk or was it a tape? I don't know. It was admitted into evidence? It was admitted into evidence. But it's for some reason not in the record? Unless I overlooked it, and I certainly looked for it. It's very clear as you go through the record that it's being played for the jury. Page 91 of the transcript notes that the videotape is being played for the jury. Page 100, while there is testimony about the walk-and-turn test, it's clear that the jury is watching the defendant, the videotape or DVD or whatever it is, perform this test. So I think the most important thing really is not so much whether it's in the record or not. It's that the jury watched it. So this is not just a case of he said, she said. It's not just a case of the two police officers saying, here was the evidence that I saw of intoxication, and the defendant and his friend saying, no, he wasn't intoxicated. But it would show if the walk-and-turn and the one-legged stand was in the mud or not. Yes, and the jury saw that, and that argument was proper to the jury. And the jury got to see whether it was in the mud. And the jury got to hear whether the defendant was slurring his words. And the jury got to see whether all of the things that were discussed, whether he tried to do the one-legged stand test, whether he refused to do the heel and toe test. But we don't know that. But the jury does, and it was the jury's. It was, first of all, it was the jury's place to discuss. This is a factual issue where the jury is presented with the videotape. It's presented with the testimony of the police officers. It's presented with the testimony of the defendants. So even if the tape showed that it was in the mud on the side of the hill and that, I guess, it was raining hard. It had been raining. And everything was performed improperly as per the national highway standard, that you're saying that's good enough? No, Your Honor. Okay. I don't understand, then, what you're saying. I am saying that this is something else in addition to the testimony of the police officers and defendants. Oh, I understand that. That the jury could take into account. And certainly, if the videotape shows something totally contrary to the defendant's. But we'd never know. Right. And it's the defendant's duty to present. Make a record. The record. That record's not there. So I do think it's important also to note that the trial court, when it denied the statutory summary suspension, made a point of the fact that he had watched it and that you could see, the trial court said, that you can see that he's staggering. You can hear that he's slurring his words. That was just, that gives us an idea of what. But he'd be a finder of fact, then. In the statutory summary suspension case, he was, yes. A non-jury part of the trial. Right. But he did say, quoting from the denial of the statutory summary suspension, again, we don't have the videotape. The defendant didn't provide it to us. The jury did see it. But I do think this gives us a snapshot of what that videotape showed, which is the trial court saying that this, and here I'm quoting, clear from the videotape that the defendant was slurring his speech. It was clear that in his efforts to do the heel and toe, he was not able to do it. And then Officer Draper asked the defendant, could he do the one-legged stand, and he said, I'm not doing this. So that gives us a nice, he said, I'm not doing this. He wouldn't, he didn't. So, again, it would have been nice if that videotape was there. It's not there. It's the defendant's burden to put it there. But we have a trial court that gives us a little snapshot of what was in that, and we have a jury that must have seen the same thing, else it couldn't have reached the verdict that it did find, I mean, did come to. So it is one of the things. Now, the other thing we need to talk about is that this is not a case where the only evidence of intoxication is bloodshot eyes or the only evidence of intoxication is alcohol on the breath. This is what both police officers testified to. Well, the defendant admitted that he had at least three alcoholic drinks. They shared a bottle of wine, and he had the beer. And this is in a two-hour period of time. By his own admission, he says that it's a dark, rainy night, and he couldn't hardly see, and yet he decides to pull out and pass the semi. I think that's something that can be considered as doesn't, I would say it questions his judgment. More specifically, both police officers said there was the strong smell of alcoholic beverage. The first police officer who asked for the defendant's driver's license said he fumbled for three or four minutes trying to get his driver's license out of his wallet. He was staggering. The videotape apparently also reflects that he was staggering. And this was their testimony that he was staggering, which the videotape, I think the record reflects that the videotape showed that. But also, my point is, do you discount mud and rainstorm and side of the highway on a slope? That's what I don't understand. That's what happened. Oh, I thought there was evidence that it was on a slope on the side of the highway. It was on flat ground, not raining? It was wet. Well, it wasn't raining anymore. The... See, I don't know. I don't know what the record says. Yes, I know. And I'm trying to recall it, too. I believe that the police officer testified that it had been raining, that it had stopped. They were not in the mud. They were on the shoulder of the road. It was mud. Is the road shut down or is there vehicles flying by? There were probably vehicles flying by. But that would have certainly nothing to do with the slurred speech. It would certainly have nothing to do with the strong smell of alcohol. Another interesting thing is the defendant's very emotional state. He was at times very depressed, and yet when they put him in the police car, he started laughing. Now, is that in evidence? Yes, Your Honor. Okay. By testimony. Yes, Your Honor. Because we have a tape. Yes. He failed the HGN test. He failed to complete the heel and toe test. He refused the one-legged stand. This is all from the testimony of both police officers, the police officer that administered the test and the other police officer that watched her administer the test. He refused the blood alcohol test. Evidence of refusal to take it is also evidence of consciousness of guilt. So we have a lot of things here going on, not just one, not even two, not just one police officer but two who confirmed to each other that there was a lot of evidence. This is simply a case we need to consider the standard of review for both the first or I guess it would be the second issue and the fourth issue. One is manifest weight and one is sufficiency of the evidence. Both of these standards of review require great deference to the conclusion reached by the jury. And as I say, the jury listened to the testimony of the first police officer who contacted the defendant, listened to the testimony of the Illinois State Police officer who conducted the tests. They watched the video tape. They listened to the testimony of the defendant, his girlfriend, and his colleague that he was meeting at the restaurant. It's a balancing test. They listened to it. Maybe they were credible. But the trial court specifically noted that he found both police officers credible. And he went on to note that clearly the jury had found them credible too since they had found the defendant guilty. So we have five witnesses, the two police officers, the defendant, his two friends, and we have the video tape. All of that evidence was presented to the jury. The review is deferential to the verdict, and I think that we can't say that that verdict is in manifest weight. We can't say that it's unreasonable, arbitrary, or not based on the evidence, or that the opposite conclusion is clearly apparent, nor can we say that no rational trier of fact could have found the elements, the essential elements of the crime, the unreasonable doubt. That's our standard of review for both Issue 2 and Issue 4. And so I want to move on to the question about the field sobriety test. I think it's important to consider where this issue arises. There was no motion to suppress filed in this case, which would have been the more typical way in which the propriety of field sobriety tests would be challenged. There was no expert testimony presented by the defendant as far as how these tests were provided. Instead, what we have is cross-examination by trial counsel, who was apparently carrying a book. Maybe it was the National Highway and Traffic Safety Administration book. Maybe it wasn't. I don't know. You don't know. Jerry didn't know. It was a book. And he would ask a series of questions that frequently began with, what if I told you? What if I told you that the National Highway Transportation Safety Act says 14 passes are required for the HGN test? What if I told you that the HGN test had to be 82 to 90 seconds long? So if I told you that the NHTSA requires dry surface to perform a heel and toe test, I would be wrong? If the NHTSA says the heel must be dry for the one-legged stand, you don't know that? If I were to tell you that the NHTSA requires 14 passes, I'd be wrong? What if I were to tell you that the error level for the one-legged stand was 35%? Those are questions based on, I guess, this book. I mean, without going beyond the record, there is absolutely no idea to know what this book was, how old the book was. I can tell you that my own – I'm going beyond the record by saying this, but I have found the latest version of the NHTSA online, and a lot of those numbers that were cited are wrong. For example, that error level of 35% for the one-legged stand. But we don't know. I mean, this is not impeachment. This is not asking the trial court to take judicial notice of whatever this book was. This is not the defendant putting his own expert on the stand and saying, this is what the NHTSA says how to do it, and it was done wrong because of this, this, and this. This is essentially trial counsel testifying. Was there any objection by the state? The state certainly – I think there were some objections, but not every time. And certainly in closing argument, when this same thing was followed through, with closing argument being made that the NHTSA says this, and it wasn't done right there, that the state specifically did in its rebuttal argument, no, that there was no book in testimony, nothing to say that it was done right. So basically the position was this cross-examination was done. There were some objections, whether sustained or not, and it was argued to be true. Correct. And we don't know what the book is. I'm sorry? We don't know what the book is. No, I realize that, that there were some objections. That is my recollection. Were the objections sustained or what? Your Honor, I don't recall. But my point being, on cross-examination, counsel says, what if I told you you had to do this ten times? And the response from the officer is, that's not the way I was taught to do it. That's kind of how the testimony goes in this case. What if I were to say this, and the police officer says, that's not the way I was taught to administer the test. I don't agree with that number that you put forth. Things like that. If there is a question from the police officer about what if I told you this is the, if I were to tell you NHTSA requires 14 passes, I'd be wrong. The police officer says, yes, I think you would be. Was there any motion to either mark that testimony or to strike it after the testimony was given because it was not in compliance with these regulations? No, Your Honor. It was simply a cross-examination technique. I guess that's what I would say. Challenging the police officer's method of doing it, the police officer's responding with how she had been trained to do it. I think it's also important to note that the other police officer observed, the first police officer that arrived on the scene, observed the tests. And he testified to the training that he also had received on the field sobriety tests. And he said that the tests were administered in the way that he also had been trained to do these. Finally, I think it's important to note that if you look at what the Supreme Court said in People v. McCown, McCown does say that the NHTSA manual sets forth the procedural for administering the HGM test. It doesn't say exactly what that test is. So McCown does not support the defendant's argument that the tests were done improperly and that the what-ifs that were presented to the officers were correct. And in fact, the procedure set forth in McCown about the HGM says that officers should look for lack of smooth pursuit, distinct nystagmus at maximum deviation, and angle of onset of nystagmus prior to 45 degrees. That's exactly what Trooper Draper testified that she did. So to the extent that McCown does tell us exactly how the HGM test needs to be administered, the testimony of Trooper Draper shows that she did what McCown says should be done. Thank you, Counsel. Counsel? Judge, I know you're feeling terrible, so I'll be quick. Don't worry about me. I talk about, she spoke of McCown, and I've spoken about McCown, and page 18 of McCown indicates what the officer didn't do right, and therefore the testimony on the nystagma was not allowed, and they had a fry hearing on all this stuff. But one of the interesting things is this. Evidence of the horizontal nystagmus test, field sobriety testing, when performed according to the National Highway Transportation Safety Administrative Protocol by properly trained officers is admissible. Now, what am I to do as a cross-examiner in this case except she says, A, that she was trained and recertified every three years, that she studied the National Traffic Highway Safety Act and agrees that this is propagated in the protocol of the state police. She says that's right. She knows about it. She's administering it. And she's doing it wrong. She doesn't know how to do it. She doesn't know the facts. And then she says this. She said after, at the point after, this is my question to you. At the point after the HGN test, what is your opinion as to whether or not the defendant was under the influence of alcohol? Her answer, after the HGN test, I believe he was under the influence of alcohol. And there was probable cause. Okay. This is on page 61 of the record, RR126. So, A, she sees Barnes. He's out there. Barnes says, I think this guy's intoxicated. So she takes over and rushes to judgment. And then she does this bogus, excuse my French, bogus HGN test, which does not comply with the Highway Safety. And at that time, she believes there's probable cause. Probable cause to believe that he's intoxicated. Now, that's the rush to judgment. Probable cause. It says that right on page 61. Now, we go on in the cross-examination of her. She doesn't know anything about this test. It's on page, have you made up your mind that he was under the influence of alcohol? No. After you gave him the opportunity to do the test, the HGN test, yes. Then he failed. Yes. Okay. Then we go to the cross-examination of the situation. She said she hasn't done any studies. Did you tell anyone in school when you went to refresh your course that this test was only 68% accurate? They told us the accuracy. I don't remember. I thought it was higher than that. I don't remember. Could it be 77%? I don't know. Could it be 35%? I don't know. How many times have you waved your fingers or something in front of a person's eyes to check their eyes? And she said, I don't know how many passes I made. I checked one eye. How many clues did you find? Six. You said you found three in your report. Didn't you? I have to refer to my report. I mean, this is, I don't know. And then I asked her if there was a time limit on how long you conducted the stigmas test in seconds or minutes. She said, I don't believe there's any time limit on it. What if I told you that it had to be done at least in 82 to 90 seconds? This is all out of the National Traffic Safety Act. What if I were to tell you, would you be wrong? Would it be wrong? I don't know. How do you examine an expert unless you have a treatise on what he is giving the test on other than cross-examination? Certainly, we don't have the money to hire experts in every case. You don't need to bring them in every case and have them sit there and listen to her testify and say, now, what'd you do wrong? We have a Bible on this, the National Traffic Safety Act, which the state follows and adheres to strictly. And that's the reason for McNallum, because Trooper didn't follow it. And it was unreliable evidence. And this is unreliable evidence, and it's her reason for attaching probable cause, which is a constitutional situation, a Fourth Amendment situation. So anyway, and then the last thing I'm going to say is it's not under the National Traffic Safety Act the only test to determine probable cause. It's not the only test. It requires two more tests. And she said that earlier on in the case. It requires a walk-and-turn case, and it requires a one-legged test. Thank you very much. Thank you. We appreciate the briefs and arguments of both counsel. As I said before, we will give you leave to supplement with cases and an opportunity to respond. And we'll take the case under advisement. Court is adjourned.